# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

LIFEBRITE LABORATORIES, LLC; and CHRISTIAN FLETCHER,

      Plaintiffs,

v.

Case No. 1:23-cv-03748-JPB

BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC. d/b/a FLORIDA BLUE; BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA, INC.; ELEVANCE HEALTH, INC. f/k/a ANTHEM INSURANCE COMPANIES, INC.; UNITEDHEALTH GROUP INCORPORATED; AETNA HEALTH INC. (Georgia); and AETNA HEALTH INC. (Florida),

      Defendants.

# DEFENDANTS' CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES......................................................................iv

INTRODUCTION..................................................................................1

FACTUAL BACKGROUND ...................................................................4

I.  Plaintiffs' Relationships with the Rural Hospitals...........................4

II.  The Government Drove the Criminal Investigation.........................5

III.  Defendants' Alleged Wrongdoing ..................................................6

IV.  The Grand Jury Proceedings and Various Guilty Pleas...................7

V.  The Grand Jury Finds Probable Cause to Issue an Indictment
Against Fletcher and His Remaining Criminal Co-Conspirators
and the Government Pursues Two Criminal Trials........................8

VI.  The "Place of Service" Code Was Irrelevant to the Government's
Case.............................................................................................11

LEGAL STANDARD ...........................................................................14

ARGUMENT .......................................................................................14

I.  Plaintiffs' Claims Are Barred by the Doctrine of Sovereign Immunity
and its Variants............................................................................14

    A.  Defendants Are Insulated from Liability as Agents of OPM .............15

    B.  Defendants Administered Health Benefit Plans to Government
Authority.................................................................................16

II.  Plaintiffs' Claims Are Preempted by FEHBA .............................19

III.  Defendants Are Entitled to Statutory Immunity ...........................22

i

IV. The Amended Complaint Does Not State a Claim for Malicious Prosecution ............................................................................... 23

    A. The Amended Complaint Does Not Plausibly Allege That *Defendants* Instigated *Fletcher's* Prosecution ..................................... 24

    B. Fletcher Does Not Plausibly Allege the Absence of Probable Cause .................................................................................. 27

        1. *Fletcher's Malicious Prosecution Claim Is Barred by the Denial of His Motion for Acquittal in the Criminal Case* ............. 27

        2. *Fletcher Does Not Plausibly Allege the Absence of Probable Cause* ............................................................................. 28

    C. Fletcher Does Not Plausibly Allege Civil Conspiracy or Aiding and Abetting ........................................................................ 31

V. Plaintiffs Fail to State a Claim for Violation of Georgia's RICO Statute ..................................................................................... 32

    A. The Amended Complaint Fails to State a Georgia RICO Claim Under O.C.G.A. § 16-14-4(a) Against Any Defendant ................................. 32

    B. Plaintiffs Do Not State a Claim Under O.C.G.A. § 16-14-4(b) or (c) .................................................................................. 36

VI. LifeBrite Fails to Plead Viable Claims for Tortious Interference ................. 37

    A. LifeBrite's Tortious Interference Claims Are Time-Barred ............... 37

    B. The Tortious Interference Claims Have No Plausible Facts ............... 38

VII. Plaintiffs' "Fraudulent Scheme" Count Fails to State a Claim ..................... 42

    A. Plaintiffs' Fraud Claim Does Not Meet Rule 9(b)'s Heightened Pleading Standard ................................................................. 42

B.      Plaintiffs Fail to Plead the Requisite Elements of Fraud ...................44

     *1. There Are No Well-Pleaded Allegations of a Misrepresentation* ..45

     *2. Plaintiffs Do Not Plead the Required Elements of Intent or Reliance* ...........................................................................................45

     *3. Plaintiffs Do Not Plead the Required Elements of Causation* .......46

VIII.   Plaintiffs Fail to State a Claim for Defamation.............................................46

A.      Plaintiffs' Defamation Count Is Time-Barred ...................................46

B.      Plaintiffs Fail to Identify Any Defamatory Statement........................47

C.      The Defamation Count Fails Because the Defendants' Conduct Was Not the Cause of Damages ..........................................................48

IX.    The Aetna Defendants Should Be Dismissed as Improper Parties ...............48

X.     The Amended Complaint Should Be Dismissed as a Shotgun Pleading ......49

XI.    The Amended Complaint Should Be Dismissed with Prejudice ..................50

CONCLUSION ...................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Almanza v. United Airlines, Inc.*,
    851 F.3d 1060 (11th Cir. 2017)......................................................37

*Ambrosia Coal & Constr. Co. v. Pages Morales*,
    482 F.3d 1309 (11th Cir. 2007).............................................33, 42

*Anderson v. Occidental Life Ins. Co. of Cal.*,
    727 F.2d 855 (9th Cir. 1984)................................................15, 17

*Armstrong v. Floyd Cnty.*,
    No. 13-CV-0050, 2013 WL 8711442 (N.D. Ga. Dec. 3, 2013)......................5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................14, 47

*Atlanta Mkt. Ctr. Mgmt. Co. v. McLane*,
    503 S.E.2d 278 (1998) ...........................................................40

*Aylward v. SelectHealth, Inc.*,
    35 F.4th 673 (9th Cir. 2022) .....................................................22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................14, 22, 45

*Burgess v. Religious Tech. Ctr., Inc.*,
    600 F. App'x 657 (11th Cir. 2015) ..........................................32, 33, 34

*Burkey v. Gov't Emps. Hosp. Ass'n*,
    983 F.2d 656 (5th Cir. 1993)......................................................20

*Bushman v. Seiler*,
    755 F.2d 653 (8th Cir. 1985)......................................................18

*Captain Jack's Crab Shack, Inc. v. Cooke*,
    No. 21-11112, 2022 WL 4375364 (11th Cir. Sept. 22, 2022) ......................28

*Catalina Worldwide, LLC v. Info. & Infrastructure Techs., Inc.*,
　　No. 22-CV-02757, 2023 WL 4844081 (N.D. Ga. June 2, 2023) .................43

*C.C. v. H.K. Grp. of Co.*,
　　No. 21-cv-1345, 2022 WL 467813 (N.D. Ga. Feb. 9, 2022) .......................37

*Ctr. for Reconstructive Breast Surgery, LLC v. Blue Cross Blue Shield of La.*,
　　No. CIV.A 11-806, 2014 WL 4930443 (E.D. La. Sept. 30, 2014) ...............16

*Cisneros v. Petland, Inc.*,
　　972 F.3d 1204 (11th Cir. 2020) .......................................................36, 37, 44

*Club Madonna Inc. v. City of Mia. Beach*,
　　42 F.4th 1231 (11th Cir. 2022) ...................................................................20

*Coventry Health Care of Mo., Inc. v. Nevils*,
　　581 U.S. 87 (2017) .................................................................................15, 19

*Day Realty Assocs., Inc. v. McMillan*,
　　277 S.E.2d 663 (Ga. 1981) ....................................................................23, 24

*Do Sung Uhm v. Humana, Inc.*,
　　620 F.3d 1134 (9th Cir. 2010) .....................................................................22

*Doe #1 v. Red Roof Inns, Inc.*,
　　21 F.4th 714 (11th Cir. 2021) .....................................................................37

*Douglas v. Bigley*,
　　628 S.E.2d 199 (Ga. Ct. App. 2006) ...........................................................35

*Durham Com. Cap. Corp. v. Liriano*,
　　No. 19-CV-0900, 2019 WL 13207588 (N.D. Ga. Aug. 26, 2019) .........31, 32

*Eckart v. Allstate Northbrook Indem. Co.*,
　　No. 22-CV-00281, 2023 WL 2143465 (N.D. Ga. Feb. 17, 2023) ...............43

*Empire HealthChoice Assur., Inc. v. McVeigh*,
　547 U.S. 677 (2006) ...................................................................... 19

*Everett v. Cobb Cnty.*,
　No. 17-CV-2292, 2018 WL 2219435 (N.D. Ga. May 15, 2018) .................. 26

*Feldman v. Am. Dawn, Inc.*,
　849 F.3d 1333 (11th Cir. 2017) ............................................... 36, 40

*Franklin v. Curry*,
　738 F.3d 1246 (11th Cir. 2013) ...................................................... 42

*FT Glob. Cap., Inc. v. Future Fintech Grp., Inc.*,
　No. 21-CV-00594, 2021 WL 5232483 (N.D. Ga. Nov. 10, 2021) .............. 44

*Gen. Surg. Assoc., P.A. v. Humana Health Plan of Tex., Inc*.,
　No. SA-14-CA-31, 2014 WL 12496771 (W.D. Tex. Apr. 21, 2014) ........... 20

*Hagler v. Williams*,
　No. 19-CV-03015-JPB, 2022 WL 18107099 (N.D. Ga. Sept. 21, 2022) ..... 39

*Harduvel v. Gen. Dynamics Corp*.,
　878 F.2d 1311 (11th Cir. 1989) ...................................................... 17

*Hepstall v. Humana Health Plan, Inc*.,
　No. CV 18-0163, 2018 WL 6588555 (S.D. Ala. Nov. 26, 2018) ................ 22

*Horsley v. Feldt*,
　304 F.3d 1125 (11th Cir. 2002) ........................................................ 5

*Hunter v. Atlanta Pub. Sch*.,
　No. 18-cv-00869-JPB, 2020 WL 10574760 (N.D. Ga. Dec. 28, 2020) ........ 50

*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga.*, *Inc.*,
　No. 12-CV-1607, 2014 WL 360291 (N.D. Tex. Feb. 3, 2014) .................... 16

*Jackson v. Kmart Corp.*,
    851 F. Supp. 469 (M.D. Ga. 1994) ..............................................................26

*Jannuzzo v. Glock, Inc.*,
    721 F. App'x 880 (11th Cir. 2018) ..............................................5, 23, 33, 34

*Jannuzzo v. Glock, Inc.*,
    No. 15-CV-2445, 2017 WL 1036486 (N.D. Ga. Mar. 17, 2017)....................5

*Jannuzzo v. Glock, Inc.*,
    No. 15-CV-2445, 2016 WL 3076651 (N.D. Ga. June 1, 2016)..............23, 31

*Johnson v. Univ. Health Servs., Inc.*,
    161 F.3d 1334 (11th Cir. 2001)..............................................................44, 45

*Joseph v. Bernstein*,
    612 F. App'x 551 (11th Cir. 2015) ..............................................................50

*Kaiser v. Tara Ford, Inc.*,
    546 S.E.2d 861 (Ga. Ct. App. 2001) .....................................................24, 26

*Kaye v. Humana Ins.*,
    2009 WL 455438 (S.D. Fla. Feb. 23, 2009)................................................22

*Keh v. Americus-Sumter Cnty. Hosp. Auth.*,
    No. 03-CV-68, 2006 WL 871109 (M.D. Ga. Mar. 31, 2006) ......................46

*Kelly v. Serna*,
    87 F.3d 1235 (11th Cir. 1996)......................................................................29

*Lakeside Invs. Grp., Inc. v. Allen*,
    559 S.E.2d 491 (Ga. Ct. App. 2002) ...........................................................35

*Lechter v. Aprio, LLP*,
    565 F. Supp. 3d 1279 (N.D. Ga. 2021) ..................................................34, 36

*Livingston v. Blue Cross & Blue Shield of Ala.*,
788 F. Supp. 545 (S.D. Ala. 1992).............................................16, 17, 18, 19

*Long v. A.L. Williams & Assocs., Inc.*,
323 S.E.2d 868 (Ga. Ct. App. 1984).......................................................37, 38

*Mabra v. SF, Inc.*,
728 S.E.2d 737 (Ga. Ct. App. 2017)...............................................................40

*Magluta v. Samples*,
256 F.3d 1282 (11th Cir. 2001)................................................................49, 50

*Mahajan v. Blue Cross Blue Shield Ass'n*,
No. 16-CV-6944, 2017 WL 4250514 (S.D.N.Y. Sept. 22, 2017)...........20, 21

*Malibu v. Anthem Blue Cross Life*,
No. CV 16-5229, 2016 WL 5746337 (C.D. Cal. Sept. 30, 2016)................. 16

*Master Mind Music, Inc. v. Block Enters., LLC*,
No. 12- CV-162, 2012 WL 6625754 (N.D. Ga. Dec. 18, 2012)....................38

*Matranga v. Travelers Ins.*,
563 F.2d 677 (5th Cir. 1977)................................................................... 14, 15

*McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*,
501 F.3d 1244 (11th Cir. 2007).......................................................................14

*Melton v. LaCalamito*,
282 S.E.2d 393 (Ga. Ct. App. 1981).............................................................24

*Mentis El Paso, LLP v. Health Care Serv. Corp.*,
58 F. Supp. 3d 745 (W.D. Tex. 2014).......................................................16, 19

*Mercer Glob. Advisors Inc. v. Crowley*,
No. 21-CV-03932, 2023 WL 2531727 (N.D. Ga. Mar. 15, 2023)..........38, 40

*Monroe v. Sigler*,
　　353 S.E.2d 23 (1987) ......................................................................23, 27, 28

*Morgan v. City of Valdosta*,
　　No. 11-CV-177, 2013 WL 3339047 (N.D. Ga. July 2, 2013).......................28

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
　　297 F.3d 1182 (11th Cir. 2002)....................................................................14

*Pani v. Empire Blue Cross Blue Shield*,
　　152 F.3d 67 (2d Cir. 1998)....................................................................17, 18

*Parekh v. CBS Corp.*,
　　820 F. App'x 827 (11th Cir. 2020) ..............................................................47

*Peterson v. Blue Cross/Blue Shield of Tex.*,
　　508 F.2d 55 (5th Cir. 1975)..........................................................................17

*Petlechkov v. FedEx Corp.*,
　　No. 22-CV-4555, 2023 WL 2871651 (N.D. Ga. Apr. 7, 2023) ..............35, 36

*Pollman v. Swan*,
　　723 S.E.2d 290 (Ga. Ct. App. 2011) ............................................................35

*Pombert v. Glock, Inc.*,
　　171 F. Supp. 3d 1321 (N.D. Ga. 2016) ........................................................25

*Pompy v. Monroe Bank & Tr.*,
　　No. 19-10334, 2020 WL 6298102 (E.D. Mich. Aug. 5, 2020) ...............22, 23

*Ray v. Spirit Airlines, Inc.*,
　　836 F.3d 1340 (11th Cir. 2016).....................................................................36

*Renton v. Watson*,
　　739 S.E.2d 19 (Ga. Ct. App. 2013) ..............................................................48

*Scott v. J.P. Morgan Chase & Co.*,
    296 F. Supp. 3d 98 (D.D.C. 2017) ............................................................... 17

*Serveco N. Am., LLC v. Bramwell*,
    No. 22-CV-140, 2023 WL 2583275 (N.D. Ga. Mar. 20, 2023) .............. 46, 47

*Shea v. Best Buy Homes, LLC*,
    533 F. Supp. 3d 1321 (N.D. Ga. 2021) ....................................................... 35

*Sledge v. PHH Mortg. Corp.*,
    No. 22-CV-1704, 2022 WL 18777529 (N.D. Ga. Nov. 14, 2022) ......... 42, 43

*Truell v. Blue Cross & Blue Shield of Fla., Inc.*,
    No. 08-CV-103, 2008 WL 11336248 (M.D. Fla. Mar. 31, 2008) ................ 19

*Turk v. Morris, Manning, & Martin LLP*,
    593 F. Supp. 3d 1258 (N.D. Ga. 2022) ....................................................... 27

*United States v. Byrns*,
    No. 3:19-CR-166 (M.D. Fla.) ........................................................... 7, 26, 29

*United States v. DiBernardo*,
    775 F.2d 1470 (11th Cir. 1985) ............................................................ 29, 30

*United States v. Marcotte*,
    No. 3:19-CR-00113 (M.D. Fla.) ............................................................. 7, 25

*United States v. Nordic Vill., Inc.*,
    503 U.S. 30 (1992) ...................................................................................... 14

*United States v. Perez*,
    No. 3:20-CR-00086 (M.D. Fla.) ..........................................................*passim*

*United States v. Rey*,
    811 F.2d 1453 (11th Cir. 1987) ..................................................................... 5

*United States v. Turkette*,
    452 U.S. 576 (1981) ....................................................................... 36

*USI Ins. Servs. LLC v. Se. Series of Lockton Cos.*,
    --- F. Supp. 3d ---, 2021 WL 912258 (N.D. Ga. Mar. 10, 2021) ................... 41

*U-Tec Constr., Inc. v. Phoenix Loss Control, Inc.*,
    No. 21-CV-00265, 2022 WL 902727 (N.D. Ga. Mar. 28, 2022) ...... 41, 43, 44

*Vista Acquisitions, LLC v. W. Shore Walden, LLC*,
    No. 22-CV-739, 2023 WL 2145515 (N.D. Ga. Feb. 21, 2023) ................... 36

*Vrijesh S. Tantuwaya MD, Inc. v. Anthem Blue Cross Life & Health Ins.*,
    169 F. Supp. 3d 1058 (S.D. Cal. 2016) ................................................. 16, 19

*Washington v. Skechers USA, Inc.*,
    No. 18-CV-03731, 2019 WL 3334765 (N.D. Ga. July 24, 2019) ................ 48

*Watkins v. Cap. City Bank & Guar.*,
    No. 19-CV-04345, 2020 WL 9607008 (N.D. Ga. Jan. 31, 2020) ........... 47, 48

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
    792 F.3d 1313 (11th Cir. 2015) ...................................................................... 49

*W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*,
    287 F. App'x 81 (11th Cir. 2008) ........................................................... 42, 43

*Williams v. Blue Cross & Blue Shield of Va.*,
    827 F. Supp. 1228 (E.D. Va. 1993) ............................................................... 20

*Willis v. Brassell*,
    469 S.E.2d 733 (Ga. Ct. App. 1996) ...................................................... 24, 26

*Wurth USA, Inc. v. Spetalnick*,
    No. 22-CV-01204, 2023 WL 2293337 (N.D. Ga. Feb. 28, 2023) ........... 41, 42

*Wylie v. Denton*,
746 S.E.2d 689 (Ga. Ct. App. 2013)..............................................35

*Zeal Glob. Servs. Priv. Ltd. v. SunTrust Bank*,
508 F. Supp. 3d 1303 (N.D. Ga. 2020) ........................................31

**STATUTES:**

5 U.S.C. § 8901, et seq. .............................................................15

5 U.S.C. § 8902 .........................................................................21

5 U.S.C. § 8902(a).....................................................................15

5 U.S.C. § 8902(m)(1)...............................................................19, 20

5 U.S.C. § 8913(a).....................................................................21

42 U.S.C. § 1395w-26(b)(3).......................................................21

O.C.G.A. § 9-3-31 .....................................................................37

O.C.G.A. § 16-14-4(a)...............................................................32, 33

O.C.G.A. § 16-14-4(b) ..............................................................32, 36

O.C.G.A. § 16-14-4(c)...............................................................32

O.C.G.A. § 16-143-3(5)(A)........................................................33

O.C.G.A. § 16-143-3(5)(B)........................................................33

O.C.G.A. § 33-1-16 ...................................................................22

O.C.G.A. § 33-1-16(d)(3)...........................................................22

**TABLE OF AUTHORITIES (continued)**

Page(s)

O.C.G.A. § 33-39-22 ...........................................................................22

O.C.G.A. § 51-5-7(2) ..........................................................................48

O.C.G.A. § 51-5-8 ..............................................................................47

O.C.G.A. § 51-7-43 ............................................................................28

**RULES:**

5 C.F.R. Part 890 ...............................................................................21

5 C.F.R. § 890.101, et seq. .................................................................15

48 C.F.R. Ch. 16................................................................................21

Fed. R. Civ. P. 9(b)......................................................................*passim*

Fed. R. Civ. P. 12(b)(1) ..................................................................1, 14

Fed. R. Civ. P. 12(b)(6) ...............................................................1, 5, 14

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6), Defendants Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue ("Florida Blue"), UnitedHealth Group Incorporated ("UnitedHealth"), Elevance Health, Inc. ("Elevance"), Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. ("BCBSGA"), Aetna Health Inc. (Georgia), and Aetna Health Inc. (Florida) (together, "Aetna" and, collectively with Florida Blue, UnitedHealth, Elevance, and BCBSGA, "Defendants") move the Court for the entry of an Order dismissing the First Amended Complaint (D.E. 64) filed by Plaintiffs Christian Fletcher ("Fletcher") and LifeBrite Laboratories, LLC ("LifeBrite") (together, "Plaintiffs").

## INTRODUCTION

Plaintiffs bring this action for Defendants purportedly "duping" federal law enforcement into investigating and prosecuting Fletcher (and several others) for health care fraud. These allegations are baseless. Even the Department of Justice has described Plaintiffs' allegations as "frivolous." *See United States v. Perez, et al.*, No. 3:20-CR-00086 (M.D. Fla.), Cr. Dkt. 1042 at 4–5.[1]

In June 2020, a federal grand jury found probable cause to indict Fletcher and nine co-conspirators for a ***$1.4 billion*** health care fraud scheme. Fletcher's charges arose from his scheme to use "financially distressed . . . rural hospitals" to "bill[] false and fraudulent claims for laboratory testing under the hospitals' in-network

---

[1] Citations to "Cr. Dkt." refer to docket entries in *United States v. Perez, et al.*, 3:20-CR-0086 (M.D. Fla.).

contracts [with Defendants], even though such testing took place at independent laboratories on behalf of patients with no connection to the hospitals." *See* Cr. Dkt. 180 at ¶ 37(a), attached hereto as Exhibit 1 (the "Indictment").

It is remarkable, then, that while asserting a claim for malicious prosecution, Fletcher **admits** in his Amended Complaint that his laboratory, LifeBrite, performed tests that were billed to Defendants through the very hospitals at issue in the criminal case. *See* First Am. Compl. (the "Amended Complaint" or "FAC") ¶¶ 48–49, 54 (alleging that LifeBrite performed "confirmatory tests" billed "by, or at the direction of" the rural hospitals). He even admits that they were billed using a code that "signifie[d] to the Defendants that [the tests] were provided **at the rural hospital** for a 'non-patient.'" *Id*. ¶ 51 (emphasis added). Fletcher's claims—all of which rely on the premise that there was no basis for his prosecution—must be dismissed because he admits the facts justifying the charges against him.

Nor do Fletcher or LifeBrite identify **any** statement that **any** Defendant made to the Government about either Plaintiff. Instead, as alleged, Defendants provided information about various non-party **hospitals** (not Plaintiffs) they suspected of fraud and were required to report to the federal government. The Government investigated and the grand jury indicted.

The outcomes of the criminal charges further reflect the implausibility of Plaintiffs' claims. After three of Fletcher's co-conspirators pleaded guilty, a jury

found two people—Jorge and Ricardo Perez, *who billed the tests performed at LifeBrite*—guilty of participating in the same conspiracy about which Fletcher was charged. The jury hung as to Fletcher and others, but the Government committed to retrying the case. In the interim, two more co-defendants pleaded guilty. At the retrial of Fletcher and three co-defendants, another jury was at loggerheads over his criminal culpability and reported that it was deadlocked. Only *after* the judge issued an "*Allen* charge" did the jury finally return a not-guilty verdict as to Fletcher.

Ignoring this critical context (of which the Court may properly take judicial notice), Plaintiffs now implausibly allege that Defendants "hoodwinked" federal law enforcement into investigating, a grand jury into indicting, and a federal judge into twice trying Fletcher to avoid paying benefit claims, and assert a series of tort claims, including malicious prosecution and defamation, against Defendants.

Plaintiffs' claims fail because the Amended Complaint includes no plausible allegation either that the Defendants maliciously caused the prosecution of *Fletcher* or that Defendants made any false statements about *Fletcher or LifeBrite*. Defendants are also entitled to various immunities, Plaintiffs' claims are preempted, and Plaintiffs fail to state viable claims.

After Defendants moved to dismiss the original complaint (D.E. 50), Plaintiffs amended (D.E. 64). Yet, the same defects persist, and further amendment would be futile. The Court should therefore dismiss Plaintiffs' claims with prejudice.

## FACTUAL BACKGROUND

### I.      Plaintiffs' Relationships with the Rural Hospitals

At one time, Fletcher (and others who would eventually become his criminal co-defendants) were in the laboratory testing business.  Fletcher was the founder and CEO of LifeBrite, a clinical laboratory in Atlanta, Georgia.  FAC ¶ 1.  LifeBrite was "out-of-network" with Defendants; that is, without a contractual right to payment at a given rate for services it rendered.  *Id.* ¶ 34.  Realizing insurance companies like Defendants typically reimburse more for laboratory tests performed by in-network rural hospitals than by out-of-network laboratories like LifeBrite, Fletcher caused LifeBrite to enter a relationship with Campbellton-Graceville Hospital ("Campbellton") in Florida.[2]  *Id.* ¶ 35.

LifeBrite admits it performed urine-drug tests that were billed to Defendants "by, or at the direction of," Campbellton.  *Id.* ¶¶ 48–49.  Fletcher later expanded this lucrative relationship to other rural hospitals, including Regional General Hospital ("Regional General") and Putnam County Memorial Hospital ("Putnam").  *Id.* ¶¶ 52–53.  Plaintiffs admit tests performed by LifeBrite were billed by the hospitals using codes "signif[ying] to the Defendants that laboratory services were provided ***at the rural hospital*** for a 'non-patient.'"  *Id.* ¶¶ 51, 54 (emphasis added).  Plaintiffs did this because they could not get in-network contracts with Defendants.  *Id.* ¶ 34.

---

[2]  The Government alleged that Fletcher's criminal co-defendant, Jorge Perez, "managed and controlled" Campbellton. Cr. Dkt. 180 ¶ 1.

Plaintiffs' scheme is commonly known as "pass-through billing," as parties hide the identity of the provider performing the service using a "pass-through" billing entity so insurers reimburse claims at the billing entities' (higher) rates.

## II. The Government Drove the Criminal Investigation

Given the fact that (as explained below) federal dollars were being used in part to pay for these pass-through billing claims, federal law enforcement became interested in Campbellton, Regional General, and Putnam. *See id.* ¶¶ 92–94, 109, 122–124. By January 2018, the Department of Justice and other agencies decided to investigate and met with Defendants' personnel. *Id.* ¶¶ 80, 124.

A grand jury issued subpoenas to certain Defendants for claims data and other information. *Id.* ¶ 80. Defendants complied by, *inter alia*, providing spreadsheets reflecting claims data as it was kept in the ordinary course of business. *Id.* ¶ 82; *see also, e.g.*, Exhibit 2 (grand jury subpoena to BCBSGA) (the subpoenas issued to Defendants were materially similar).[3]

---

[3] On a 12(b)(6) motion, the Court may consider documents attached to the motion without converting it into one for summary judgment if they are central to the plaintiff's claim and their authenticity is unchallenged. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). Moreover, "A court may take judicial notice of its own records and the records of inferior courts." *United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987). Courts in this District often take judicial notice of criminal transcripts and filings connected to claims like malicious prosecution. *See, e.g.*, *Jannuzzo v. Glock, Inc.*, 2017 WL 1036486, at *4 (N.D. Ga. Mar. 17, 2017) (considering transcript from criminal trial), *aff'd* 721 F. App'x 880 (11th Cir. 2018); *Armstrong v. Floyd Cnty., Ga.*, 2013 WL 8711442, at *4 n.2 (N.D. Ga. Dec. 3, 2013) (same). In deciding this Motion, the Court can consider documents underpinning the Complaint, including the criminal indictments, as well as other documents from the public criminal docket, such as those incorporated by reference into the

After extensive investigation, the grand jury alleged that Fletcher and his criminal co-defendants engaged in a pass-through-billing scheme using the rural hospitals. *See* Ex. 1 at ¶ 37(a) ("Fletcher, and others would and did research and identify financially distressed . . . rural hospitals in the United States over which they could obtain ownership and control for the purpose of billing false and fraudulent claims for laboratory testing under the hospitals' in-network contracts, even though such testing took place at independent laboratories on behalf of patients with no connection to the hospitals.").

## III. Defendants' Alleged Wrongdoing

Plaintiffs claim that, to avoid having to pay for more tests, Defendants purportedly "concocted a scheme whereby they would falsely accuse Plaintiffs of being part of a massive insurance billing fraud conspiracy." FAC ¶ 73. According to the Amended Complaint, "Defendants alleged that this 'fraud' occurred through the use of the Place of Service [] Code 22[]," which purportedly conveyed "that the hospital itself performed the tests on behalf of patients who were physically present at the hospital (either as in-patients or out-patients)." *Id.* ¶ 74. Plaintiffs further allege that Defendants "falsely and maliciously represented" that this billing arrangement "was criminal healthcare billing fraud," *id.* ¶ 67 and that Fletcher was indicted "[b]ased on Defendants' false documents and information." *Id.* ¶ 69.

---

Complaint.

## IV. The Grand Jury Proceedings and Various Guilty Pleas

Plaintiffs allege that, in April 2019, FBI agents (not Defendants) testified before the grand jury that "all of the claims submitted by the rural hospitals were false because the claims were billed with codes and identifiers to make it appear as if these were tests done for patients physically present at the hospital." *Id.* ¶ 84.

On July 9, 2019, one of Fletcher's alleged co-conspirators, Kyle Marcotte, pleaded guilty to Conspiracy to Commit Money Laundering in connection with the scheme. *See United States v. Marcotte*, 3:19-CR-00113 (M.D. Fla.), Dkt. 10. Marcotte admitted to the operation of the scheme charged in the Indictment. *Id.* at 28–33.

On October 29, 2019, another of Fletcher's alleged co-conspirators, David Byrns, pleaded guilty to Conspiracy to Commit Health Care Fraud. *See United States v. Byrns*, 3:19-CR-166 (M.D. Fla.), Dkt. 12. In his plea, Byrns admitted he took control of Putnam and caused tests performed at "out-of-network laboratories outside Missouri" to be billed to Defendants "using Putnam's billing credentials" "as if the testing and the patients had a legitimate connection to Putnam, to take advantage of Putnam's in-network status and higher reimbursement rates." *Id.* at 30. Byrns admitted that he and his co-conspirators (including Fletcher) transitioned the scheme to Putnam after doing the same thing at Campbellton. *Id.* at 29. Marcotte and Byrns pleaded guilty before Fletcher was charged. *See* Cr. Dkt. 3 (indictment

filed June 17, 2020).  And in the Amended Complaint, Plaintiffs admit LifeBrite performed tests that were billed through Campbellton and Putnam.  *See* FAC ¶¶ 53–54.

On April 21, 2022, prior to the first trial, yet another of Fletcher's criminal co-defendants, Nestor Rojas, pleaded guilty to Conspiracy to Commit Health Care Fraud and Wire Fraud. Cr. Dkt. 575.  Rojas admitted that he and his co-conspirators agreed to perform tests at their laboratories and bill them through the rural hospitals. *Id*. at 26.  His plea focused on the use of the hospitals' National Provider Identifiers ("NPI") and Tax Identification Numbers ("TIN").  *Id*. at 24.  There is no mention of the Place of Service field.  *See id*.  Rojas also admitted certain hospitals "did not need numerous 'reference labs'" because they had no excess urine, "[a]ll urine specimens that were claimed to be associated with or were shipped to [Campbellton] came from an outside source," and "[Campbellton and Regional General] lacked the capacity to perform . . . confirmatory drug testing."  *Id*. at 29–30.

## V.     The Grand Jury Finds Probable Cause to Issue an Indictment Against Fletcher and His Remaining Criminal Co-Conspirators and the Government Pursues Two Criminal Trials

On June 17, 2020, a grand jury returned an Indictment in the Middle District of Florida against Fletcher and his co-conspirators.  FAC ¶ 66; *see also* Cr. Dkt. 3. A Superseding Indictment was filed October 7, 2020.  *See* Ex. 1.  The Indictments described how Plaintiffs and their co-conspirators used "financially distressed"

hospitals to "bill[] false and fraudulent claims for laboratory testing under the hospitals' in-network contracts, even though such testing took place at independent laboratories on behalf of patients with no connection to the hospitals." Cr. Dkt. 3, ¶ 37(a), (d). The grand jury determined that that "[n]one of the Rural Hospitals had the equipment or laboratory capacity to conduct large-scale confirmatory [urine] or blood tests." *Id.* ¶ 27. Plaintiffs do not dispute that.

In May 2022, the DOJ tried Fletcher and his criminal co-defendants over four weeks. Defendants' personnel were subpoenaed and testified truthfully that Plaintiffs did not bill the Place of Service code, *see* FAC ¶¶ 107, 116, 134, and it was data maintained by Defendants in the ordinary course of business. *See, e.g.*, Cr. Dkt. 741 at 222:8–15.[4] In closing at the first trial, the Government stated: "The defense loves to talk about the 22 code," but "I'm not going to talk about that much, because it doesn't matter. It doesn't matter." Cr. Dkt. 794 at 260:14–16.

At the first trial, the jury convicted two of Fletcher's co-defendants who were responsible for billing, Jorge Perez and Ricardo Perez, on charges of healthcare fraud, wire fraud, and conspiracy to commit money laundering. Cr. Dkts. 768–69.[5]

---

[4] "Q: Now, do you know if the 22 code is something that's placed on the claim when it's submitted to Anthem? A: It is not. Q: So how does it get there? A: It is derived by the claims processing system based on the 141 type of bill. And Anthem uses that to identify the benefits for the member that get – that get applied to the claim."

[5] Jorge Perez was sentenced to 100 months' imprisonment. Cr. Dkt. 1098. Ricardo Perez was sentenced to 75 months' imprisonment. Cr. Dkt. 1099.

The jury hung as to Fletcher and a few others. FAC ¶ 164. Fletcher then filed a Motion for Judgment of Acquittal, which was denied with a finding that the evidence was sufficient for a reasonable jury to have found Fletcher guilty "beyond all reasonable doubt." Cr. Dkt. 820, 822, 866.

After the first trial, James F. Porter, Jr. pleaded guilty to Conspiracy to Commit Health Care Fraud, Cr. Dkt. 904, and Sean Porter pleaded guilty to Conspiracy to Commit Money Laundering, Cr. Dkt. 905. James Porter admitted:

> Co-conspirators JORGE PEREZ and his brother RICARDO PEREZ, through Empower H.I.S., LLC ("Empower"), a Miami-based billing company they owned and operated, submitted claims for the Lab Tests through the hospitals as if the testing had been performed there, when in fact the overwhelming majority were performed at independent laboratories, including laboratories owned by . . . CHRISTIAN FLETCHER (LifeBrite Labs), . . . that lacked contracts with insurers (*i.e.*, laboratories that were "out of network"). Furthermore, patients providing the samples had no connection with the hospitals. Had the co-conspirators identified the out of network independent laboratories as the true provider of the Lab Tests, the insurance companies would have paid lower rates, or nothing at all, for such claims.

Cr. Dkt. 904 at 25–26.

In February 2023, the government re-tried Fletcher and three others. Once again, personnel associated with Defendants were subpoenaed and testified truthfully that Plaintiffs did not bill the Place of Service code. FAC ¶ 164; *e.g.*, Cr. Dkt. 990 at 48:11–15 ("Q: The place of service code was not put on there by any of the hospitals? A: That is correct. Q: That was put on there by Aetna? A: Yes."). After another four-week trial, the jury reported to the judge that it was deadlocked.

Cr. Dkt. 976. Only *after* the judge issued an "*Allen* charge" did the jury finally return with a not-guilty verdict as to Fletcher. Cr. Dkt. 1003; FAC ¶ 164.

## VI. The "Place of Service" Code Was Irrelevant to the Government's Case

The centerpiece of Plaintiffs' claims is that Defendants falsely convinced the Government that Plaintiffs billed the "Place of Service" code 22 on the claims they billed through the rural hospitals. But the "Place of Service" field was irrelevant in the criminal case. Indeed, the Amended Complaint does not show *any* reliance by the DOJ at *either* trial on the Place of Service code. The Indictments do not mention the Place of Service code at all. *See* Cr. Dkt. 3; Ex. 1. Instead, they focus on the criminal defendants' use of the hospitals' TINs and NPIs. *Id.*

Prior to the first trial, the Government accurately stated that "the '22' code [in the Place of Service field] is self-generated by the insurer based on the hospital's submission of the '141' type of bill code." Cr. Dkt. 477 at 10; *see also* Cr. Dkt. 478 at 11 ("[T]he government agrees that the defendants did not submit the '22' code; rather, the '22' code is self-generated by the insurer based on the hospital's submission of the '141' code.").

In the criminal case, Fletcher and his co-defendants repeatedly made the same argument about the "Place of Service" field that is now the basis for their lawsuit. *See, e.g.*, Cr. Dkt. 448 at 6. The Government called this the "reddest of red herrings":

> [The criminal co-defendants] also raise the reddest of red herrings in
> this trial: the insurers' addition of the 22 place of service code in their

11

> claims data, and the suggestion that this and other additions somehow "tainted" the data. The unrefuted evidence established that the insurers added the 22 code when claims were billed with the 141 code to signify for their own internal purposes that the service was provided at an outpatient location at the hospital (*e.g.*, the outpatient clinic at a large urban hospital). (Tobin Vol. III, p. 26-27.)

Cr. Dkt. 831 n.2. The Government repeatedly stated the Place of Service field was irrelevant: "[T]he Government has never alleged, and does not intend to allege or prove, that the hospitals made a fraudulent misrepresentation by submitting Place of Service '22' code." Cr. Dkt. 477 at 12 (The "hospitals did not submit [the Place of Service codes], and no insurer witness will testify otherwise[.]").

The Government's view was that the criminal co-defendants were "manufactur[ing] confusion" about the "Place of Service" code. *Id*. at 12; *see also* Cr. Dkt. 478 at 14. The lie was not the Place of Service code, "[t]he lie . . . [was] the identity of the entity that tested the sample — because that made all the difference to whatever the insurers would reimburse at the favorable contract rates the hospitals enjoyed for services ***they themselves provided***[.]"[6] Cr. Dkt. 831.

The DOJ also rejected Plaintiffs' arguments that the existence of the "Place of Service" field in the spreadsheets Defendants produced under subpoena was false or deceptive. *See* Cr. Dkt. 477 at 10 ("Insurers routinely generate this code because

---

[6] Fletcher understood this distinction. *See* Cr. Dkt. 873 (summarizing the Government's case as being that "most of the testing billed through these hospitals was not actually performed at these hospitals and was not medically necessary") (adopted by Fletcher at Cr. Dkt. 874).

of its relevance to their payment determinations, not, as [criminal defendant] implies, for some nefarious motive."); *id.* at 11 ("It is utterly illogical for [criminal defendant] to suggest that large commercial insurers generated information to store in their own data warehouses, and then presented it on claims spreadsheets subpoenaed by the grand jury, for the sole purpose of deceiving themselves or to facilitate the Government's prosecution of individuals who previously defrauded the insurers."); Cr. Dkt. 478 at 2 (same); *id.* at 4 (same); *id.* at 10 (same). The DOJ wrote: "The 22 code was inserted for the insurers' own internal purposes in tracking information about the claim, and its presence in no way indicates that the data was tampered with or was otherwise rendered unreliable. The Government has repeatedly explained this point in pretrial filings, at trial, and in post-trial filings." Cr. Dkt. 881 at 2.

What's more, even after Plaintiffs commenced this matter, and in response to a motion made by a non-party in the criminal case, the Government again rejected ***the entire premise of Plaintiffs' civil claims***:

> The thrust of [the non-party's] claim is his allegation that the insurance companies all got together and determined to alter claims data information, and feed it to the Government in altered form, which then caused the Department of Justice and the United States Attorney's Office for the Middle District of Florida to blindly prosecute a criminal case based on false and fraudulent pretenses. [The non-party's] motion leads only to the conclusion that if not complicit, this Court was entirely duped as well. ***These are frivolous allegations*** . . . .

Cr. Dkt. 1042 at 4–5 (emphasis added).

## LEGAL STANDARD

Under Rule 12(b)(1), the challenge can be either facial, like a Rule 12(b)(6) motion, or factual, challenging the existence of subject matter jurisdiction in fact, "irrespective of the pleadings." *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). Under Rule 12(b)(6), a complaint should be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And while the Court must accept a plaintiff's well-pleaded facts as true, it need not accept "conclusory allegations, unwarranted deductions of fact[]," *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002), or "legal conclusion[s] couched as a factual allegation." *Twombly*, 550 U.S. at 555.

## ARGUMENT

### I. Plaintiffs' Claims Are Barred by the Doctrine of Sovereign Immunity and Its Variants

Plaintiffs' claims are barred at the threshold by the doctrine of sovereign immunity, which prohibits claims against the federal government and its agents except when the government "unequivocally" waived immunity. *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33 (1992). This protection extends to federal contractors if the judgment sought against the contractor either ultimately would be satisfied by the federal treasury or would impact a federal program. *Matranga v.*

*Travelers Ins.*, 563 F.2d 677, 677 (5th Cir. 1977); *Anderson v. Occidental Life Ins. Co. of Cal.*, 727 F.2d 855, 856–57 (9th Cir.1984) (per curiam) (claim for infliction of mental anguish by Medicare carrier barred by sovereign immunity). Both concerns are present here.

### A.    Defendants Are Insulated from Liability as Agents of OPM

OPM administers the Federal Employees Health Benefits Program ("FEHBP"), in which the Government provides medical benefits to eligible federal employees, among others. *See* Federal Employees Health Benefits Act ("FEHBA"), 5 U.S.C. § 8901, et seq.; 5 C.F.R. § 890.101, et seq. Under FEHBA, OPM contracts with private health insurance "carriers" to administer FEHBP plans and carry out OPM's duties. 5 U.S.C. § 8902(a); *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 90 (2017).

Defendants contracted with OPM to administer healthcare benefits to FEHBP enrollees. *See* ECF Nos. 1, 32, & 75, and Declaration of John Aissis, attached as Exhibit 3. Plaintiffs' companies submitted claims to Defendants for patients enrolled in the FEHBP through direct contracts with OPM and subcontracts with federal employee associations. Ex. 1 ¶ 29; ECF No. 75 ¶¶ 15–17. Defendants, as contractors of the federal government, had a legal obligation to report to the Government ***any suspected*** fraudulent billing practices—which reporting now forms the basis of Plaintiffs' claims. ECF Nos. 1-4 at 16–17; 75-5 at 12–13; 32 ¶ 27; *see*

*also* 48 C.F.R. § 1652.222-70(a)(12).

Many courts have extended the doctrine of sovereign immunity to the FEHBP. *See Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 2014 WL 360291 (N.D. Tex. Feb. 3, 2014) (dismissing claims against insurer administering FEHBA benefits on account of sovereign immunity); *Vrijesh S. Tantuwaya MD, Inc. v. Anthem Blue Cross Life & Health Ins.*, 169 F. Supp. 3d 1058 (S.D. Cal. Mar. 11, 2016) (same); *Ctr. for Reconstructive Breast Surgery, LLC v. Blue Cross Blue Shield of La.*, 2014 WL 4930443 (E.D. La. Sept. 30, 2014) (same); *Mentis El Paso, LLP v. Health Care Serv. Corp.*, 58 F. Supp. 3d 745 (W.D. Tex. 2014) (same). Here, Plaintiffs claim Defendants were obligated to pay for the tests, but wrongfully withheld payment and levied false accusations. FAC ¶¶ 3, 65. The claims at issue here go to the heart of Defendants' conduct undertaken as agents of OPM, a role which requires Defendants to alert OPM to suspected fraud. And, because federal Treasury funds are used for benefit payments and for administrative expenses, sovereign immunity applies regardless of whether a plaintiff is seeking FEHBA benefits or other damages. *Malibu v. Anthem Blue Cross Life*, 2016 WL 5746337, at *7 (C.D. Cal. Sept. 30, 2016); *Mentis*, 58 F. Supp. 3d at 756.

## B. Defendants Administered Benefits Pursuant to Government Authority

Contractors administering government insurance programs are immunized "to the extent that the government is exposed to financial risk." *Livingston v. Blue Cross*

& *Blue Shield of Ala.*, 788 F. Supp. 545, 548 (S.D. Ala. 1992), *aff'd*, 996 F.2d 314 (11th Cir. 1993). "The defense derives from the principle that where a contractor acts under the authority and direction of the United States, it shares the sovereign immunity that is enjoyed by the government." *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir. 1989).

The protections afforded by sovereign immunity are broad. To withstand dismissal based on a federal contractor's assertion of sovereign immunity, a plaintiff must show "that a private contractor acted pursuant to invalidly conferred authority or exceeded its validly conferred authority." *Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 107 (D.D.C. 2017). Here, Defendants are immune because, in undertaking the conduct that forms the basis of Plaintiffs' claims, Defendants were administering health benefit plans pursuant to authority conferred to them by the U.S. Government. *See, e.g.*, ECF Nos. 1 ¶ 30; 75 ¶¶ 12–16; 32 ¶¶ 20–22.

In addition, a fiscal intermediary is immune on the rationale that the suit at issue is really one against the United States because the fiscal intermediary or carrier is an agent of the government who carries out administrative responsibilities on behalf of the government. *See, e.g.*, *Peterson v. Blue Cross/Blue Shield of Tex.*, 508 F.2d 55, 58 (5th Cir. 1975); *Anderson*, 727 F.2d at 856–57 (claim for negligent infliction of mental anguish by Medicare carrier barred by sovereign immunity). The Second Circuit's decision in *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d

67 (2d Cir. 1998), is particularly instructive. There, a medical doctor (Pani) was prosecuted for submitting false claims to a Medicare carrier. Pani sued the carrier for its role in the prosecution, asserting that the carrier tortiously interfered with various contractual relations and acted negligently or fraudulently in its notifications to the Government. The district court dismissed the complaint based on official immunity (a variant of the doctrine of sovereign immunity). On appeal, the Second Circuit concluded that the carrier was shielded from tort liability as a fiscal intermediary acting within the scope of its authority to report suspected fraud. *Id.* The court reasoned that policy considerations militate in favor of such an outcome:

> The policy considerations underlying the extension of official immunity to a federal official's duty to investigate and report suspected fraud apply with equal force to a fiscal intermediary or carrier. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy or by private contractors.

*Id.* at 73. The court remarked that the investigation and reporting of possible fraud is "precisely the type of delegated discretionary function that the public interest requires to be protected by immunity," to mitigate against the "enormous toll" exacted on the public fisc by fraud. *Id.*; *see also Bushman v. Seiler*, 755 F.2d 653, 656 (8th Cir. 1985) (rejecting plaintiff's argument that the tortious nature of the defendant's alleged conduct stripped him of immunity and noting that "to separate the activity that constitutes the wrong from its surrounding context—an otherwise

proper exercise of authority—would effectively emasculate the immunity defense");
*Livingston*, 788 F. Supp. at 550 ("Courts extend official immunity where the threat of liability might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.").

Because these doctrines insulate Defendants from tort liability for the conduct at issue, the Court lacks subject matter jurisdiction to consider Plaintiffs' claims. *See, e.g.*, *Tantuwaya*, 169 F. Supp. 3d at 1071; *Mentis*, 58 F. Supp. 3d at 745.

## II.    Plaintiffs' Claims Are Preempted by FEHBA

Even if the Court had subject matter jurisdiction, the claims should be dismissed as preempted by FEHBA. FEHBA's express preemption clause, 5 U.S.C. § 8902(m)(1), states that "FEHBA contract terms that 'relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) preempt any state laws that 'relate[] to health insurance or plans.'" *Truell v. Blue Cross & Blue Shield of Fla., Inc.*, 2008 WL 11336248, at *3 (M.D. Fla. Mar. 31, 2008). The Supreme Court recently emphasized the phrase "relate to" "express[es] a broad pre-emptive purpose" and is "notably expansive [in] sweep." *Nevils*, 581 U.S. at 96. "[S]tate law—whether consistent or inconsistent with federal plan provisions—is displaced on matters of 'coverage or benefits'" under § 8902(m)(1). *Empire HealthChoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 686 (2006).

Plaintiffs' state-law claims implicate FEHBA contractual provisions that

relate to the administration of patients' FEHBA-governed benefit plans. Plaintiffs allege Defendants were acting to avoid payments. This includes the payment of benefits under individual FEHBA plans and requires examination of whether the claims were payable in the first instance, an inquiry which cannot be disentangled from the terms of the FEHBA-governed benefit plans. "[C]laims arising out of the manner in which a benefit claim is handled are not separable from the terms of the contract that governs benefits." *Burkey v. Gov't Emps. Hosp. Ass'n*, 983 F.2d 656, 660 (5th Cir. 1993). "[S]uch claims 'relate to' the plan under § 8902(m)(1) as long as they have a connection with or refer to the plan." *Id.*; *see also Gen. Surg. Assoc., P.A. v. Humana Health Plan of Tex., Inc.*, 2014 WL 12496771, at *6 (W.D. Tex. Apr. 21, 2014); *Williams v. Blue Cross & Blue Shield of Va.*, 827 F. Supp. 1228, 1229–30 (E.D. Va. 1993) (state contract and tort claims related to how plaintiff's request was handled and were therefore expressly preempted under FEHBA).

Even if FEHBA had no express preemption provision, Plaintiffs' tort claims would still fail because of conflict-preemption (a type of implied preemption). A claim is conflict-preempted if, as here, it poses an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See, e.g.*, *Club Madonna Inc. v. City of Mia. Beach*, 42 F.4th 1231, 1253 (11th Cir. 2022); *Mahajan v. Blue Cross Blue Shield Ass'n*, 2017 WL 4250514, at *9–11 (S.D.N.Y. Sept. 22, 2017) (finding that FEHBA impliedly preempted state-law tort claims related to

20

FEHBP administered by private insurer).

Even if Plaintiffs' claims against Defendants are construed as something other than a benefits dispute, they are **still** preempted because they conflict with the statutes and regulations establishing OPM's supervisory role over FEHBA plans. Congress delegated to OPM the broad authority to police the conduct, policies, and practices of FEHBA carriers and their subcontractors, and OPM has promulgated extensive regulations on the topic. *See* 5 U.S.C. §§ 8902, 8913(a); 5 C.F.R. Part 890; 48 C.F.R. Ch. 16. Here, the broad enforcement powers Congress gave to OPM conflict with Plaintiffs' attempt to use Florida tort law to regulate the conduct of a FEHBA administrator and the terms of a FEHBA plan. *Mahajan*, 2017 WL 4250514, at *9–11. Because Plaintiffs' state law claims conflict with OPM's authority over FEHBA carriers and plans, and with the uniform federal scheme the statute is designed to create, the claims are preempted by FEHBA and should be dismissed.[7] *See* ECF No. 49.

---

[7] In addition to FEHBA preemption, Defendants also have a defense of Medicare preemption. 42 U.S.C. § 1395w-26(b)(3) ("The standards established under this part shall supersede any State law or regulation . . . with respect to MA plans which are offered by MA organizations under this part."). *See* Centers for Medicare & Medicaid Services, Medicare Advantage Plan Contract Directory, https://www.cms.gov/data-research/statistics-trends-and-reports/medicare-advantagepart-dcontract-and-enrollment-data/ma-plan-directory (last visited Dec. 3, 2023), listing all Defendants; ECF No. 75-25. Under their Medicare contracts, Defendants must comply with laws designed to prevent Medicare fraud. *See, e.g.*, 75-25 at 3. Plaintiffs' allegations relate to the standards established under Medicare to prevent, detect, and correct fraud, waste, and abuse. 42 C.F.R. § 422.503(b)(4)(vi), (d); *id.* § 422.500(b); *id.* § 422.2430(a)(ii)(4); *Hepstall v. Humana Health Plan, Inc.*,

**III.** <u>**Defendants Are Entitled to Statutory Immunity**</u>

Defendants' reporting of suspected fraudulent insurance acts is also shielded by statutory immunity conferred by O.C.G.A. § 33-1-16 and O.C.G.A. § 33-39-22. First, in the absence of fraud or bad faith, no person may be subject to civil liability for libel, slander or any other "relevant tort" for filing reports or furnishing information required by the Georgia code, and no civil cause of action of any kind shall arise against for information relating to suspected fraudulent insurance acts furnished to law enforcement. O.C.G.A.§ 33-1-16(d)(3). Second, in the absence malice or willful intent to injure, no cause of action for defamation, invasion of privacy, or negligence exists due to the disclosure of personal or privileged information gathered by insurance institutions under Chapter 39, Title 33 of the Georgia Code. *See* O.C.G.A. § 33-39-22. Plaintiffs contend that Defendants reported certain hospitals' suspected fraudulent activity, that Plaintiffs were affiliated with the hospitals, and that they were prosecuted as a result. *See, e.g.*, FAC ¶¶ 81, 82, 89. Because the conduct alleged is precisely what these statutes are designed to protect, Plaintiffs' claims should be dismissed.[8] *See, e.g.*, *Pompy v. Monroe Bank & Tr.*,

---

2018 WL 6588555, at *7 (S.D. Ala. Nov. 26, 2018). The Medicare Act's express preemption provision bars such claims. *Aylward v. SelectHealth, Inc.*, 35 F.4th 673, 680–82 (9th Cir. 2022) (fraud and other tort claims preempted); *Uhm v. Humana Inc.*, 620 F.3d 1134, 1148 (9th Cir. 2010); *Hepstall*, 2018 WL 6588555, at *7; Kaye v. Humana Ins., 2009 WL 455438, at *8 (S.D. Fla. Feb. 23, 2009).

[8] Plaintiffs' use of conclusory labels such as "malicious" does not avoid the statute's protection. *See Twombly*, 550 U.S. at 555 (court should not accept mere labels or

2020 WL 6298102, at *10 (E.D. Mich. Aug. 5, 2020) (applying similar statute and dismissing claim as "the purpose of the statute is to foster communication related to insurance fraud and prevention," and "communicating with law enforcement entities regarding an insurance fraud investigation would directly further that purpose.").

## IV. Plaintiffs Do Not State a Claim for Malicious Prosecution

In Count I, Fletcher accuses each Defendant of malicious prosecution. To state a claim, he must plead, *inter alia*, that Defendants instigated a criminal prosecution against him without probable cause. *See Jannuzzo v. Glock, Inc.*, 2016 WL 3076651, at *3 (N.D. Ga. June 1, 2016), *aff'd* 721 F. App'x 880 (11th Cir. 2018). Because he fails to plausibly do so, Count I should be dismissed.

This case perfectly illustrates why claims for malicious prosecution are "not favored" in Georgia. *Monroe v. Sigler*, 353 S.E.2d 23, 25 (Ga. 1987) (holding that denial of motion for directed verdict of acquittal at close of underlying criminal case constituted binding determination of existence of probable cause, precluding action for malicious prosecution). "It is public policy to encourage citizens to bring to justice those who are apparently guilty." *Id.* (quoting *Day Realty Assocs., Inc. v. McMillan*, 277 S.E.2d 663 (Ga. 1981)). Fletcher claims he was prosecuted based on the inclusion of the "Place of Service" field in data produced by Defendants. FAC ¶¶ 66-148. Despite more than 1,000 filings and eight weeks of transcripts

---

"legal conclusion[s] couched as a factual allegation."). As explained in detail *infra*, there are no plausible factual allegations Defendants acted out of malice or bad faith.

across two criminal trials, Fletcher cannot point to a **single instance** of the Government relying on the "Place of Service" field in its prosecution. That is because it was irrelevant. But the Court need not take Defendants' word for it. It is not mentioned in the Indictments, *see* Ex. 1, and the Government **said** it was irrelevant. Cr. Dkt. 477 at 12 ("[T]he Government has never alleged, and does not intend to allege or prove, that the hospitals made a fraudulent misrepresentation by submitting Place of Service '22' code."); Cr. Dkt. 831 n.2; Cr. Dkt. 1042 at 4–5. This is precisely why "[t]he courts have always distrusted malicious prosecution actions, and have retained a strong hand over them." *Day Realty*, 247 Ga. at 564.

A.  **The Amended Complaint Does Not Plausibly Allege That *Defendants* Instigated *Fletcher's* Prosecution**

To be liable for malicious prosecution, the prosecution must have been "*instigated* by the person sought to be held liable." *Kaiser v. Tara Ford, Inc.*, 546 S.E.2d 861, 867 (Ga. Ct. App. 2001) (emphasis in original) (citing *Willis v. Brassell*, 469 S.E.2d 733 (Ga. Ct. App. 1996)). Thus:

> If the defendant . . . merely states what he believes, leaving the decision to prosecute entirely to the uncontrolled discretion of the officer, or if the officer makes an independent investigation, . . . [he] is not regarded as having instigated the proceeding; but if it is found that his persuasion was the determining factor in inducing the officer's decision, or that he gave information which he knew to be false and so unduly influenced the authorities, he may be held liable.

*Willis*, 469 S.E.2d at 738 (quoting *Melton v. LaCalamito*, 282 S.E.2d 393, 396 (Ga. Ct. App. 1981)). The Amended Complaint does not satisfy this burden.

**First**, unlike the typical malicious prosecution where an individual is specifically but wrongly accused, the Amended Complaint does not allege that **any** Defendant made **any** statement to the Government about **Fletcher**. *See* FAC. It does not even allege a statement about LifeBrite. *Id.* Instead, Defendants are alleged to have communicated to the government *about hospitals*: Florida Blue alleged that "claims submitted by CGH and RGH were fraudulent," *id.* ¶ 92, Aetna alleged that "CGH was submitting claims . . . where the testing was not being performed at the hospital," *id.* ¶ 109, BCBSGA made a referral about "rural hospitals in Georgia,"[9] *id.* ¶¶ 121-125, and there are no discussions alleged between Anthem or United and the Government prior to their receipt of a grand jury subpoena. *See id.* ¶¶ 126-128, 131-134. Thus, **the Government and grand jury**, not Defendants, made the decision about who to charge, including Fletcher.[10] *See, e.g.*, *Pombert v. Glock, Inc.*, 171 F. Supp. 3d 1321, 1338-39 (N.D. Ga. 2016) (dismissing one claim because defendant reported criminal activity by someone other than plaintiff, and another because plaintiff "is not mentioned a single time" in defendant's communication with Government, and all other allegations were "in the form of group pleading");

---

[9] In their Motion to Remand, Plaintiffs deny any connection to Chestatee Regional Hospital, the only Georgia hospital in the criminal case. Dkt. 28 at 18.

[10] Fletcher had nine co-defendants and two more alleged co-conspirators who were charged separately. *See* Ex. 1; *see also Byrns*, 3:19-cr-166 (M.D. Fla.); *Marcotte*, 3:19-cr-00113 (M.D. Fla.). The Amended Complaint does not allege Defendants played any role in the decision about who to charge.

*Jackson v. Kmart Corp.*, 851 F. Supp. 469, 472 (M.D. Ga. 1994) (no claim for malicious prosecution where "independent decision" to arrest made by others).

**Second**, Fletcher does not plausibly allege that the "Place of Service" field was material to the charging decision. *See Willis*, 469 S.E.2d at 738; *Kaiser*, 546 S.E.2d at 867; *Everett v. Cobb Cnty.*, 2018 WL 2219435, at *3 (N.D. Ga. May 15, 2018) ("To unduly mislead someone . . . such facts must be material, meaning that they would have had a significant effect on the official's judgment."). The Indictments identify certain fields in the claims that were fraudulent, but the "Place of Service" is not among them. *See* Ex. 1, ¶ 35 (use of hospitals' NPIs and TINs), ¶ 37j (same). The Government repeatedly and consistently stated that the "Place of Service" field was irrelevant. *See, e.g.*, Cr. Dkt. 477 at 12; Cr. Dkt. 831 n. 2; Cr. Dkt. 487 at 14. In closing at the first trial, the Government stated: "The defense loves to talk about the 22 code," but "I'm not going to talk about that much because it doesn't matter. It doesn't matter." Cr. Dkt. 794 at 260:14–16. Nor does Fletcher identify **any** reliance by the Government on the "Place of Service" field. Because the Government did not rely on that field, it was not material. *See Everett*, 2018 WL 2219435, at *3 (dismissing claim where allegedly misleading evidence not material).

**Third**, Plaintiffs claim the mere inclusion of the "Place of Service" field in the claims data "falsely represented" that the hospitals billed that code. FAC ¶ 83. But the grand jury subpoenas sought "all records or documents" that "constitute,

relate to or refer to" claims submitted by or on behalf of the hospitals, which included

fields (*e.g.*, payment amounts) that are not submitted on claims by providers.  *See,*

*e.g.*, Ex. 2 (grand jury subpoena).[11]  The mere **existence** of the "Place of Service"

field, which existed in Defendants' data, cannot be a misrepresentation.

## B.    Fletcher Does Not Plausibly Allege the Absence of Probable Cause

1.    *Fletcher's Malicious Prosecution Claim Is Barred by the Denial of His Motion for Acquittal in the Criminal Case.*

In the first criminal trial against Fletcher, the jury hung.  Cr. Dkts. 768–75.

Fletcher moved for acquittal.  Cr. Dkt. 790.  The Government opposed, rejecting

Fletcher's contention that LifeBrite had a legitimate relationship with the hospitals:

> The evidence was clear that there never was any 'referencing' or 'outsourcing' of samples from any hospital to LifeBrite. As Fletcher acknowledges, the flow worked the other way around: LifeBrite sent samples to CGH and RGH for screening testing and performed confirmatory testing itself. As with [laboratories operated by Fletcher's co-conspirators], this served no purpose whatsoever given that LifeBrite could have performed the screening test itself, and only resulted in a delay in getting the screening test performed and results back to the ordering providers.

Cr. Dkt. 831 at 26–27.  Chief Judge Corrigan, who presided over both criminal trials,

denied the motion.  Cr. Dkt. 866.  That ruling bars Fletcher's claim for malicious

prosecution.  *Monroe*, 353 S.E.2d at 25 (denial of motion for acquittal constitutes

---

[11] The Court may consider the grand jury subpoena because it is incorporated by reference in the Amended Complaint.  Plaintiffs argue the production of claims data in response thereto was a misrepresentation. That makes it central to their claims. *Turk v. Morris, Manning, & Martin LLP*, 593 F. Supp. 3d 1258, 1287 (N.D. Ga. 2022) (citations omitted); *see also supra* n.2.

binding determination of the existence of probable cause); *Captain Jack's Crab Shack, Inc. v. Cooke*, 2022 WL 4375364, at *12 (11th Cir. Sept. 22, 2022) (stating that *Monroe* held that "[p]robable cause is conclusively established under Georgia law where a trial court denies the criminal defendant's motion for a directed verdict. . . [absent] fraud, perjury, or subornation."); *Morgan v. City of Valdosta*, 2013 WL 3339047, at *6–7 (N.D. Ga. July 2, 2013) (dismissing claim in light of *Monroe*).

2.     *Fletcher Does Not Plausibly Allege the Absence of Probable Cause.*

Fletcher does not plausibly allege the absence of probable cause, which "shall exist when the circumstances are such as to satisfy a reasonable [person] that the accuser had no ground for proceeding but his desire to injure the accused." O.C.G.A. § 51-7-43.  As there *was* probable cause, the claim should be dismissed.

***First***, there was probable cause to allege Fletcher engaged in the offense charged (*i.e.*, using distressed hospitals to bill for tests performed by LifeBrite, for patients with no connection to the hospitals).  *See* Cr. Dkt. 3, 180.  Plaintiffs admit that LifeBrite performed tests at its laboratory that were billed to Defendants through Campbellton, Regional General, and Putnam.  FAC ¶¶ 1, 48–50, 54.  Remarkably, Plaintiffs also admit these tests were billed by the hospitals using a code that "signifie[d] to the Defendants that laboratory services were provided ***at the rural hospital***."  *Id*. ¶¶ 51–52 (emphasis added).  The Amended Complaint does not

identify **any** disclosure on the claims billed to Defendants that LifeBrite performed the tests; Fletcher claims it was not possible. *Id*. ¶ 138. The Government and Defendants viewed this as fraud; Fletcher says it was legal. *Id*. ¶ 137. But, given the facts Fletcher admits, there was probable cause to believe Fletcher materially misrepresented where the tests were performed, as charged. *See* Cr. Dkt. 3, 180.

**Second**, prior to Fletcher's indictment, his co-conspirator, David Byrns, pleaded guilty to Conspiracy to Commit Health Care Fraud. *See Byrns*, 3:19-cr-166 (M.D. Fla.), Dkt. 12. In his plea, Byrns admitted he took control of Putnam and caused tests performed at "out-of-network laboratories outside Missouri" to be billed "using Putnam's billing credentials" to Defendants "as if the testing and the patients had a legitimate connection to Putnam, in order to take advantage of Putnam's in-network status and higher reimbursement rates." *Id*. at 30. He admitted that his co-conspirators did the same thing at Campbellton. *Id*. at 29. Fletcher admits LifeBrite was one of the laboratories performing tests that were billed through both Campbellton and Putnam. *See* FAC ¶¶ 53–54. Thus, even if Defendants had instigated the criminal charges against Fletcher, they had probable cause to do so.

**Third**, the Indictments are additional evidence of probable cause. *See Kelly v. Serna*, 87 F.3d 1235, 1241 (11th Cir. 1996) (indictment constitutes *prima facie* evidence of probable cause); *see also United States v. DiBernardo*, 775 F.2d 1470, 1476–77 (11th Cir. 1985) (grand jury's two "basic functions" are "(1) the

determination of whether there is probable cause to believe a crime has been committed and (2) the protection of citizens against unfounded criminal prosecutions"). The Indictments do not rely on the "Place of Service" field at all. *See* Ex. 1.

**Fourth**, Fletcher does not plausibly allege that, but for the "Place of Service" field and statements about it, there would have been an absence of probable cause. Fletcher filed an unsuccessful Motion to Dismiss. *See* Cr. Dkt. 212. Even after the Government confirmed the criminal defendants did not bill the "Place of Service" field, Nestor Rojas pleaded guilty, Cr. Dkt. 575, Jorge Perez and Ricardo Perez were convicted, Cr. Dkts. 768–69, and the jury hung on the charges against Fletcher in the first trial. Cr. Dkts. 768–75. Fletcher filed a Motion for Judgment of Acquittal, which was denied. Cr. Dkts. 790, 866. The Government, fully informed of all relevant facts, chose to retry the charges against Fletcher. Cr. Dkt. 814. Before the second trial, two more alleged co-conspirators pleaded guilty. Cr. Dkts. 904 & 905.

The outcomes of the charges against the twelve criminal defendants are proof of probable cause: a jury convicted two (Cr. Dkts. 768-69); five pleaded guilty (Cr. Dkts. 575, 904, 905); one has yet to be arraigned; and four were acquitted (Cr. Dkts. 1005–08). The Amended Complaint does not allege that Defendants had **any** role in the decision about which criminal defendants to charge. But the results of the prosecution make clear there was probable cause to report suspected fraud **by the**

30

*hospitals*, which is all Plaintiffs allege that Defendants did. *See* FAC. Accordingly, the Court should dismiss Fletcher's claim for malicious prosecution.

## C.     Fletcher Does Not Plausibly Allege Civil Conspiracy or Aiding and Abetting

Fletcher makes single-paragraph, conclusory assertions that Defendants are liable for malicious prosecution under theories of civil conspiracy and aiding and abetting. FAC ¶¶ 165–66. These conclusory allegations plainly do not satisfy Rule 9(b)'s particularly requirement. *See Jannuzzo*, 2016 WL 3076651, at *4 (claim sounding in fraud failed because must be stated with particularity under 9(b)). These theories of liability also fail because Fletcher does not state a viable claim for malicious prosecution against any Defendant for the reasons set forth above.

Fletcher cannot extend liability via civil conspiracy because the Amended Complaint does not plausibly allege facts supporting any ***agreement*** between the Defendants to maliciously prosecute him. *See, e.g.*, *Zeal Glob. Servs. Priv. Ltd. v. SunTrust Bank*, 508 F. Supp. 3d 1303, 1313–16 (N.D. Ga. 2020) (granting motion to dismiss conspiracy claim for failure to plausibly allege "agreement"). Nor do Plaintiffs plausibly allege any aiding and abetting by a Defendant of another Defendant's malicious prosecution of Fletcher; they do not allege facts reflecting that any "knowingly participated" in another Defendants' malicious prosecution of Fletcher. *See Durham Com. Cap. Corp. v. Liriano*, 2019 WL 13207588, at *5–6 (N.D. Ga. Aug. 26, 2019) (analyzing aiding and abetting liability under Georgia law

at motion to dismiss). This is particularly true given that most of the actions complained of in the Amended Complaint were compelled by legal process (*e.g.*, grand jury or trial subpoenas) directed to specific Defendants.

## V. **Plaintiffs Fail to State a Claim for Violation of Georgia's RICO Statute**

Perhaps because Georgia law forecloses their claim for malicious prosecution, Plaintiffs try to spin that claim into one under Georgia's Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO"). They assert Georgia RICO claims under O.C.G.A. § 16-14-4(a) and (b) against each Defendant for "their coordinated smear campaign spreading false allegations through the use of the mail and interstate wire communications, and by perjury and providing false information to federal authorities." FAC ¶¶ 171–72. They allege a RICO conspiracy under O.C.G.A. § 16-14-4(c) for the same conduct. *Id.* ¶ 173. Georgia courts' skepticism for malicious prosecution actions should extend to other causes of action that simply reassert malicious prosecution claims in another name. In any event, Plaintiffs' Georgia RICO claim must be dismissed for a multitude of reasons.

### A. **The Amended Complaint Fails to State a Georgia RICO Claim Under O.C.G.A. § 16-14-4(a) Against Any Defendant.**

Because Plaintiffs' Georgia RICO claim relies on acts allegedly akin to fraud, it must be pleaded with particularity under Rule 9(b). *See Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 663–64 (11th Cir. 2015) (affirming Rule 9(b) in dismissal of Georgia RICO claim); *Ambrosia Coal & Constr. Co. v. Pages Morales*,

482 F.3d 1309, 1316 (11th Cir. 2007) ("Civil RICO claims . . . must be pled with an increased level of specificity." (citing Fed. R. Civ. P. 9(b))). To satisfy Rule 9(b), Plaintiffs must allege two predicate offenses and: "(1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud." *Jannuzzo*, 721 F. App'x at 884 (citing *Ambrosia Coal*, 482 F.3d at 1316–17).

Plaintiffs' claim under O.C.G.A. § 16-14-4(a) must be dismissed for at least four reasons. ***First***, Plaintiffs do not sufficiently allege two acts of racketeering activity by each Defendant. "Racketeering activity" means certain crimes that are "chargeable by indictment under the laws of" Georgia or "under the laws of the United States." O.C.G.A. § 16-143-3(5)(A) & (B). An alleged "smear campaign" is not racketeering activity. *See* FAC ¶ 172. Plaintiffs fail to set forth the necessary ***factual*** allegations required by Rule 9(b), including the facts undergirding the alleged predicate offenses; the precise misrepresentations made by ***any*** Defendant, much less each Defendant; allegations of the time, place, and person responsible for the misrepresentation(s); and the content and manner in which Plaintiffs or others were misled. The only allegations are that Defendants investigated a spike in claims and reported suspected fraud; yet Plaintiffs conclusorily assert Defendants engaged in two criminal predicate offenses. *See id.* ¶¶ 92–136. Because the Amended

Complaint is wholly lacking in facts pleaded with particularity sufficient to establish two acts of racketeering activity *per Defendant*, the claim must be dismissed. *See Jannuzzo*, 721 F. App'x at 884 (affirming dismissal of Georgia RICO claims because of "vague and conclusory allegations which fail[ed] to assert the 'when, where, by whom, or specifically what' of the predicate offenses alleged").[12]

*Second*, even if Plaintiffs had pleaded two acts of racketeering activity per Defendant, they do not plausibly allege that each Defendant *knew* the falsity of the alleged misstatements. *See, e.g.*, *Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279, 1318–19 (N.D. Ga. 2021) (where misrepresentation is predicate act, "allegations regarding Defendants' knowledge of the fraud cannot be merely conclusory and unsupported by any factual allegations" (quotations omitted)).

*Third*, the gist of Plaintiffs' claim is that Defendants had no basis to accuse Plaintiffs of fraud. *See, e.g.*, FAC ¶¶ 2, 67, 70. But statements as to the legality of an act cannot form the basis for a fraud claim because "all persons are presumed to know the law and thus cannot justifiably rely on erroneous statements of law." *Douglas v. Bigley*, 628 S.E.2d 199, 206 (Ga. Ct. App. 2006) (citing *Lakeside Inv.*

---

[12] This is also precisely the type of shotgun pleading the Eleventh Circuit has repeatedly rejected in pleadings asserting RICO claims. *See, e.g.*, *Ambrosia Coal*, 483 F.3d at 1317 (affirming dismissal of civil RICO claims "devoid of specific allegations with respect to each defendant"); *Burgess*, 600 F. App'x at 663 (affirming dismissal of Georgia RICO claim because pleading "lump all the defendants together as the sources of the misrepresentations").

*Grp., Inc. v. Allen*, 559 S.E.2d 491, 493 (Ga. Ct. App. 2002); *Shea v. Best Buy Homes, LLC*, 533 F. Supp. 3d 1321, 1337 n.10 (N.D. Ga. 2021) ("misrepresentation as to a matter of law is a statement of opinion only"). This rule makes particular sense here, where any statements were allegedly made to federal law enforcement who are tasked with determining what is, and is not, criminal fraud.

**Fourth**, the Amended Complaint lacks particularized factual allegations that Plaintiffs' injuries "flowed directly from at least one of the predicate acts." *See Wylie v. Denton*, 746 S.E.2d 689, 694 (Ga. Ct. App. 2013). "The standard for establishing causation is high: 'When a court evaluates a [Georgia] RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.'" *Petlechkov v. FedEx Corp.*, 2023 WL 2871651, at *3 (N.D. Ga. Apr. 7, 2023) (Boulee, J.) (citing *Pollman v. Swan*, 723 S.E.2d 290, 292 (Ga. Ct. App. 2011)). Plaintiffs "must allege more than that an act of racketeering occurred and that [they were] injured." *Id.* at *3 (citing *Wylie*, 746 S.E.2d at 694). Plaintiffs allege in conclusory fashion that they "suffered economic injury that flowed directly from" and "was proximately caused" by Defendants. FAC ¶ 174. But Plaintiffs' injuries, whatever they may be, are the result of the Government's decision to charge them, the grand jury's indictment, the combined result of multiple criminal trial proceedings, and the ultimate disposition of the criminal case, all of which break the chain of causation. *See Petlechkov*, 2023 WL

2871651, at *4 (dismissing Georgia RICO claim where plaintiff could not establish proximate cause when superseding facts break causal chain).

**B.    Plaintiffs Do Not State a Claim Under O.C.G.A. § 16-14-4(b) or (c).**

In addition to the defects set forth above that require dismissal, Plaintiffs' claim under O.C.G.A. § 16-14-4(b) must be dismissed because it does not include particularized facts alleging the existence of an "enterprise." *See Lechter*, 565 F. Supp. 3d at 1316 (enterprise required under § 16-14-4(b)).  This would require particularized facts evidencing "an ongoing organization, formal or informal, and . . . evidence that the various associates function as a continuing unit." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1352 (11th Cir. 2016) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).[13]  But Plaintiffs rely entirely on bald allegations of Defendants' operation as a "continuing unit," and there are no particularized facts evidencing that Defendants were not, for example, each operating in their own (parallel) self-interest and pursuant to their independent legal obligations to OPM to report suspected fraud and cooperate with the resulting investigations. *See, e.g.*, *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1212 (11th Cir. 2020) (plaintiff failed to allege collective action to make money *by fraud*, as opposed to "obvious alternative

---

[13] Although *Ray* was evaluating the federal RICO statute, the federal and Georgia RICO statutes are "'essentially identical,' meaning the failure to state a claim under the federal act warrants dismissal under the Georgia Act." *Vista Acquisitions, LLC v. W. Shore Walden, LLC*, 2023 WL 2145515, at *8 (N.D. Ga. Feb. 21, 2023) (quoting *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1342 (11th Cir. 2017)).

explanation" that they were trying to make money by sales and lacked specific allegations of communications between defendants to commit fraud); *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1068 (11th Cir. 2017) ("[P]arallel conduct alone cannot support a plausible inference of an agreement.")

Plaintiffs' Georgia RICO conspiracy claim fails for the same reason: they do not allege particular facts demonstrating the existence of a conspiracy, as opposed to merely parallel conduct. It also fails because the Amended Complaint does not state an underlying substantive Georgia RICO claim. *See, e.g.*, *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 728 (11th Cir. 2021) (affirming dismissal of Georgia RICO conspiracy claim relying on "same threadbare allegations as the substantive RICO claims"); *C.C. v. H.K. Grp. of Co.*, 2022 WL 467813, at *5 (N.D. Ga. Feb. 9, 2022) (dismissing Georgia RICO conspiracy claim based on "same threadbare allegations as the substantive RICO claims," which were also dismissed).

## VI.  LifeBrite Fails to Plead Viable Claims for Tortious Interference

LifeBrite presents claims for tortious interference with contractual relationships (Count III) and tortious interference with business relationships (Count IV). These claims fail for at least two reasons.

### A.  LifeBrite's Tortious Interference Claims Are Time-Barred

Claims for tortious interference with contract or business relationships are subject to a four-year statute of limitations. *Long v. A.L. Williams & Assocs., Inc.*, 323 S.E.2d 868, 870 (Ga. Ct. App. 1984) (citing O.C.G.A. § 9-3-31). LifeBrite's

tortious interference claims are time-barred because they are based on conduct pre-dating July 20, 2019. LifeBrite does not identify any post-July 20, 2019, actions taken by a Defendant that interfered with any relationship. The latest allegations as to *any* Defendant relate to June 5, 2019, grand jury testimony (FAC ¶ 114), but the last allegations as to most Defendants are even earlier. *See, e.g.*, *id*. ¶ 124 (last act by BCBSGA in January 2018); *id*. ¶ 106 (Florida Blue's alleged acts of providing a claims spreadsheet to the DOJ occurred in April 2018).[14] The tortious interference claims should be dismissed with prejudice on statute of limitations grounds.

## B. The Tortious Interference Claims Have No Plausible Facts

To prevail on either type of tortious interference claim, a plaintiff must plausibly allege that a defendant: (1) acted improperly and without privilege; (2) acted purposefully and maliciously with the intent to injure; (3) induced a third party not to enter into or continue a business or contractual relationship with the plaintiff; and (4) caused the plaintiff some financial injury. *Mercer Glob. Advisors Inc. v. Crowley*, 2023 WL 2531727, at *8 (N.D. Ga. Mar. 15, 2023) (Boulee, J.).

Here, LifeBrite presents conclusory allegations about two vague groups of relationships: (1) relationships between LifeBrite and the rural hospitals and

---

[14] To the extent LifeBrite intends to rely on the "discovery rule," that doctrine is inapplicable. The "Georgia Supreme Court . . . expressly limited the theory of continuing torts and the 'discovery rule' to personal injury cases. Because tortious interference with contractual relations is not a personal injury claim, the 'discovery rule' does not apply here." *Master Mind Music, Inc. v. Block Enters., LLC*, 2012 WL 6625754, at *5 (N.D. Ga. Dec. 18, 2012) (citations omitted).

(2) relationships between LifeBrite and unnamed "clients" participating in referral programs. FAC ¶ 179. But the Amended Complaint fails to state a claim as to either group of relationships because it does not plausibly allege that *any* Defendant had *any* knowledge of *any* of the contracts or business relations. *See* FAC. "A party cannot intentionally and maliciously induce a breach of a contract of which he or she is unaware." *Hagler v. Williams*, 2022 WL 18107099, at *4 (N.D. Ga. Sept. 21, 2022) (Boulee, J.). Plaintiffs' scheme was to **hide** the involvement of LifeBrite to obtain the more lucrative reimbursement the rural hospitals were entitled to. *See* Cr. Dkt. 130. The Amended Complaint only alleges Defendants communicated about the **hospitals**. *See* FAC. Because it fails to plausibly allege that Defendants had knowledge of any of these contracts or business relationships, Plaintiffs' claims for tortious interference should be dismissed.

As to LifeBrite's contracts with the hospitals, to the extent LifeBrite plausibly alleges the **existence** of such contracts (*e.g.*, FAC ¶¶ 35, 53, 180), it does not allege that Defendants **interfered** with those contracts. *Id.* ¶ 180. In fact, LifeBrite alleges it exited those contractual relationships of its own accord. *Id.* ¶¶ 61–62.

Nor does it allege, under the first element, that Defendants acted without privilege. Under Georgia law, "parties to an interwoven contractual arrangement and parties that have a direct economic interest in or would benefit from a contract with which they are alleged to have interfered are not strangers to the contract or

relationship" and are therefore "privileged" under the first element. *Mercer*, 2023 WL 2531727, at *8 (Boulee, J.) (quoting *Feldman*, 849 F.3d at 1344); *Feldman*, 849 F.3d at 1344 (quoting *Mabra v. SF, Inc.*, 728 S.E.2d 737, 739–40 (Ga. Ct. App. 2017)). In fact, LifeBrite alleges that Defendants had contracts with the hospitals that long pre-dated LifeBrite's contracts with the hospitals, so Defendants had their own direct economic interests in the relationships. *See* FAC ¶¶ 3, 50, 53, 54, and, *especially*, ¶ 60 ("Based on their claim that the laboratory outreach programs at CGH, RGH and Putnam were not permitted under the insurance payors' policies and/or existing contracts with the hospitals, Defendants took action to disrupt the programs, such as by stopping payments, placing the programs under performance review and conducting audits.").

As LifeBrite admits, it contracted with the hospitals because they could not get contracts with Defendants directly. *See* FAC ¶¶ 27–32. LifeBrite also admits tests performed by LifeBrite were billed by the hospitals to Defendants, meaning Defendants were paying the tests performed by LifeBrite. *See id.* ¶¶ 50, 53. But, to be liable for tortious interference under Georgia law, "one must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract." *Atlanta Mkt. Ctr. Mgmt. Co. v. McLane*, 503 S.E.2d 278 (1998). Because Defendants are not strangers to the relationship giving rise to LifeBrite's contracts with hospitals, there can be no tortious interference.

As to LifeBrite's relationships with its "clients," LifeBrite has a different, but equally fatal problem: while vaguely concluding "interference" with contracts or relationships between LifeBrite and unidentified non-hospital healthcare "clients," LifeBrite never identifies a single contract with a "client" or even a "client" that was induced to avoid entering a business relationship because of Defendants' alleged conduct. Rather than provide particularized facts, LifeBrite relies on conclusory allegations that mirror the elements of the claim. *See* FAC ¶¶ 180, 187–89. Plaintiffs must plausibly allege the existence of a contract that was interfered with. *See Atlanta Mkt. Ctr. Mgmt.*, 269 Ga. at 608. And a claim for tortious interference with business relations must plausibly allege at least one client or opportunity that was lost because of the alleged interference. *See U-Tec Constr., Inc. v. Phoenix Loss Control, Inc.*, 2022 WL 902727, at *4 (N.D. Ga. Mar. 28, 2022) (Boulee, J.) (dismissing tortious interference claim because plaintiff had not identified third parties that were induced into not entering into a business relationship); *USI Ins. Servs. LLC v. Se. Series of Lockton Cos.*, 2021 WL 912258, at *6 (N.D. Ga. Mar. 10, 2021) ("[I]n the absence of [plaintiff] identifying a single client lost, [plaintiff] has failed to state a claim for tortious interference with business relations.")).

Where, like here, a complaint does not include plausible factual allegations concerning the contracts or business relationships that were purportedly interfered with, the claims must be dismissed. *See Wurth USA, Inc. v. Spetalnick*, 2023 WL

2293337, at *7 (N.D. Ga. Feb. 28, 2023) (Boulee, J.); *Franklin v. Curry*, 738 F.3d 1246, 1248 n.1 (11th Cir. 2013) ("[W]e afford no presumption of truth to legal conclusions and recitations of the basic elements[.]")).

## VII.  Plaintiffs' "Fraudulent Scheme" Count Fails to State a Claim

In Count V, Plaintiffs assert a cause of action for "fraudulent scheme." Though case law reveals no such recognized civil cause of action in this jurisdiction, to the extent Plaintiffs intended to allege common law fraud under Georgia law, that attempt fails for various reasons.

### A.  Plaintiffs' Fraud Claim Does Not Meet Rule 9(b)'s Heightened Pleading Standard

Causes of action sounding in fraud must comply with Rule 9(b), which means that the Amended Complaint must inform each defendant of the nature of his alleged participation in the fraud. *Ambrosia Coal,* 482 F.3d at 1317 n.12 (affirming dismissal of fraud action on Rule 9(b) grounds for failure to describe the nature of each defendant's participation in the joint fraudulent scheme). Specifically, "[t]o satisfy Rule 9(b), a plaintiff must allege, at a minimum, the time, place, and content of the alleged misrepresentation; the fraudulent scheme; the fraudulent intent of the defendant; and the injury resulting from the fraud." *Sledge v. PHH Mortg. Corp.*, 2022 WL 18777529, at *7 (N.D. Ga. Nov. 14, 2022); *see also W. Coast Roofing & Waterproofing, Inc. v. John Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008). Plaintiffs fail to do any of those things here. *See generally* FAC.

Instead, Plaintiffs lump Defendants together in bare-bones, conclusory, and formulaic recitations of claim elements. *See, e.g.*, FAC ¶¶ 195–196 ("***Defendants***' fraudulent scheme consisted of a smear campaign whereby they published false allegations of LifeBrite"). Plaintiffs' allegations might as well apply to any fraud case ever asserted. *See, e.g.*, *id.* ¶ 194 ("***Defendants*** directly engaged in a fraudulent scheme, ***and/or*** conspired with others to engage in a fraudulent scheme"). This is insufficient to state a claim.

At base, Plaintiffs fail to inform Defendants of the "who, what, where, when, why, and how" of the alleged fraud, as required. *Sledge*, 2022 WL 18777529, at *7 (dismissing fraud claims) (citing *W. Coast Roofing*, 287 F. App'x at 86 ("The 'particularity' requirement 'serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior.'")). Moreover, this Court has been consistent in dismissing fraud claims that failed to meet 9(b)'s heightened pleading standard. *See, e.g.*, *Catalina Worldwide, LLC v. Info. & Infrastructure Techs., Inc.*, 2023 WL 4844081, at *2 (N.D. Ga. June 2, 2023) (Boulee, J.) (dismissing with prejudice for failure to plead "requisite details surrounding the alleged fraudulent scheme such as specific dates, times or places."); *Eckart v. Allstate Northbrook Indem. Co.*, 2023 WL 2143465, at *6 (N.D. Ga. Feb. 17, 2023) (Boulee, J.) (same).

And this Court has taken care to impose the required pleading standards where, as here, the defendants were impermissibly lumped together. *U-Tec Constr., Inc.*, 2022 WL 902727, at \*2 (dismissing fraud claim, among other reasons, because, "Plaintiff also failed to specify which allegations apply to which Defendants, and 'generalized allegations 'lumping' multiple defendants together are insufficient' for a fraud claim");[15] *FT Glob. Cap., Inc. v. Future Fintech Grp., Inc.*, 2021 WL 5232483, at \*5 (N.D. Ga. Nov. 10, 2021) (Boulee, J.) (dismissing fraud claim against a single defendant where fraud was alleged against multiple individuals because a plaintiff must "specify which individual made which misrepresentation . . . [as] even if [p]laintiff had identified specific statements constituting fraud, [p]laintiff did not attribute those statements to their speakers with the requisite specificity").

## B. Plaintiffs Fail to Plead the Requisite Elements of Fraud

Under Georgia law a claim for fraud consists of five elements: "(1) a misrepresentation by the defendant, (2) intent to deceive, (3) intent to induce the plaintiff to act or refrain from acting, (4) justifiable reliance on the misrepresentation, and (5) damage." *Johnson v. Univ. Health Servs., Inc.,* 161 F.3d 1334, 1341 (11th Cir. 2001). Plaintiffs plead none of these. *See generally* FAC.

---

[15] *See also Cisneros*, 972 F.3d at 1217 (affirming dismissal and holding that, "blending the identities of the defendants in her allegations of fraud . . . is precisely the kind of vagueness in fraud pleadings Rule 9(b) was designed to prevent").

1. *There Are No Well-Pleaded Allegations of a Misrepresentation*

For the reasons stated above (*see supra*, Sections IV, V), Plaintiffs do not sufficiently allege a misrepresentation by ***any*** Defendant.  *See generally Oxford Asset Mgmt.*, 297 F.3d at 1188 (court need only accept "well-pleaded" facts as true).

2. *Plaintiffs Do Not Plead the Required Elements of Intent or Reliance*

Plaintiffs also fail to allege facts giving rise to ***Defendants'*** requisite state of mind or ***Plaintiffs'*** reliance.  Plaintiffs provide a formulaic recitation in Count V that Defendants "intended that these industry participants and law enforcement would rely on their false allegations."  FAC ¶ 196.  This Court should not accept such legal conclusions couched as factual allegations.  *Twombly*, 550 U.S. at 555.  Not only do these bare-bones allegations fail to satisfy the second element "intent to deceive," but they also fail to satisfy the third element of an "intent to induce ***the plaintiff*** to act or refrain from acting" and the fourth element of ***Defendants'*** "justifiable reliance."  *Johnson,* 161 F.3d at 1341.  There is no allegation that Defendants attempted to induce ***Plaintiffs*** to do anything, or that Plaintiffs justifiably relied on any representations from anyone.  *See* FAC ¶ 196.  Further, the predicate factual allegations as cherry picked by Plaintiffs only demonstrate that Defendants intended to act in compliance with requirements from law enforcement, not any improper intent.  *See, e.g.*, *id*. ¶ 80 (grand jury requested claims data); *id.* ¶ 106 (Florida Blue provided claims data spreadsheets in response to grand jury subpoenas); *id.* ¶ 112 (Aetna did same); *id.* ¶ 128 (Anthem did same); *id.* ¶ 107 (alleging that Florida

Blue's trial testimony was accurate).

3.  *Plaintiffs Do Not Plead the Required Element of Causation*

Nor can Defendants' alleged conduct be the legal cause of the damages alleged. The operative indictment returned by the grand jury was based on information outside of that which Plaintiffs allege Defendants provided to law enforcement. *See generally* FAC, Ex. 1; *see also supra* Sections IV, V.

## VIII. <u>Plaintiffs Fail to State a Claim for Defamation</u>

Plaintiffs' Count VI, for defamation, fails for at least three reasons.

### A. **Plaintiffs' Defamation Count Is Time-Barred**

In Georgia, a defamation claim is subject to a one-year limitations period. Plaintiffs filed their Complaint on July 20, 2023. Putting aside for the moment that Plaintiffs do not specify the date on which Defendants allegedly defamed them (let alone which Defendants defamed them, through what publication, and in what manner), the statute of limitations bars liability for any defamatory statement made before July 20, 2022. *See Serveco N. Am., LLC v. Bramwell*, 2023 WL 2583275, at *7 (N.D. Ga. Mar. 20, 2023) (dismissing defamation claim due to statute of limitation bar); *Keh v. Americus-Sumter Cnty. Hosp. Auth.*, 2006 WL 871109, at *6 (M.D. Ga. Mar. 31, 2006) ("Neither Plaintiff's Complaint nor her Amended Complaint allege any statement or action of any Defendant subsequent to [one year before the filing of the complaint].") The Amended Complaint is devoid of any allegation that supports any defamatory statement made by any Defendant after July 20, 2022.

## B. Plaintiffs Fail to Identify Any Defamatory Statement

The Amended Complaint is also devoid of allegations that would support a defamation claim. Plaintiffs only conclusorily allege that "[unspecified] Defendants published [unspecified] false and defamatory statements about LifeBrite in [unspecified] letters and [unspecified] emails and through other [unspecified] means [at an unspecified time]." FAC ¶ 201; *Iqbal*, 556 U.S. at 664 (courts need only accept "well-pleaded" factual allegations). This claim should be dismissed because there are insufficient allegations of defamatory statements. *See, e.g.*, *Serveco*, 2023 WL 2583275, at *8 (granting motion to dismiss defamation claim and holding that, "the Court cannot deny a motion to dismiss based on speculation or facts that have not been alleged"). The only conduct Plaintiffs allege Defendants engaged in was supported by probable cause and could not have formed the basis of a defamatory statement. *See supra* Sections IV, V. Moreover, none of the statements alleged were ***about Plaintiffs***. *See id.*; *see also Parekh v. CBS Corp.*, 820 F. App'x 827, 833–34 (11th Cir. 2020) (affirming order granting motion to dismiss because "a defamatory statement must be 'of and concerning' the plaintiff to be actionable."). Finally, to the extent the statements at issue were statements that occurred in the course of the underlying legal proceeding, those statements are entitled to absolute immunity pursuant to O.C.G.A. § 51-5-8.[16] *See Washington v. Skechers USA, Inc.*, 2019 WL

---

[16] Under Georgia law, "[a]ll charges, allegations, and averments contained in regular pleadings filed in a court of competent jurisdiction, which are pertinent and material to the relief sought, whether legally sufficient to obtain it or not, are privileged. However false and malicious such charges, allegations, and averments may be, they

3334765, at *4 (N.D. Ga. July 24, 2019) (dismissing defamation and libel claims based on absolute privileged conduct from prior judicial proceedings); *Watkins v. Cap. City Bank & Guar.*, 2020 WL 9607008, at *3 (N.D. Ga. Jan. 31, 2020) (same).

### C. Defendants' Conduct Was Not the Cause of Damages

Finally, even accepting Plaintiffs' allegations, Defendants' unidentified statements cannot reasonably be inferred to be the legal cause of Plaintiffs' alleged damages. As already explained, the Indictment does not once mention the Place of Service field but does detail extensive alleged criminal wrongdoing. FAC, Ex. 1.

### IX. The Aetna Defendants Should Be Dismissed as Improper Parties

The Amended Complaint is devoid of any allegation tying Aetna Health Inc. (Georgia) or Aetna Health Inc. (Florida) to the acts alleged. *See* FAC ¶¶ 109–17 (ambiguously referring to "Aetna"). Despite Aetna's prior filings noticing Plaintiffs that proper defendants included Aetna affiliate Aetna Life Insurance Company ("ALIC") and Claims Administration Corp. ("CAC"), Plaintiffs fail to name either ALIC or CAC in the Amended Complaint in a likely attempt to circumvent jurisdictional issues. *See* ECF No. 23 at 1 n.1; ECF No. 48-1 at 7; ECF No. 75 at 2;

---

shall not be deemed libelous." O.C.G.A. § 51-5-8. "The absolute privilege afforded by [§ 51-5-8] is not limited to 'pleadings' . . . but 'has been more broadly construed . . . to include 'official court documents' and acts of 'legal process.'" *Renton v. Watson*, 739 S.E.2d 19, 24 (Ga. Ct. App. 2013). Additionally, statements made in good faith in the performance of a legal duty, are privileged and cannot serve as the basis for a claim. O.C.G.A. § 51-5-7(2). Plaintiffs' claims, therefore, fail as they depend on allegations that Defendants responded to grand jury subpoenas and supplied trial testimony—conduct occurring during a judicial proceeding related to that proceeding. Under Georgia law, therefore, such conduct is privileged.

ECF No. 75-4 ¶ 6 ("CAC and ALIC first made contact with the government regarding their fraud suspicions as to the underlying hospitals on or about July 28, 2016, when they reported those suspicions to OPM pursuant to their obligations as [FEHB] plan contractors.").  Because there are no specific allegations of wrongdoing by either Aetna Defendant, they should be dismissed as improper parties.

## X.  The Amended Complaint Should Be Dismissed as a Shotgun Pleading

The Amended Complaint *also* suffers from at least two of the quintessential pleading deficiencies that the Eleventh Circuit has described as "mortal sin[s]" requiring dismissal because they do not "give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).  *First*, in each count Plaintiffs improperly incorporate all preceding allegations.  *See* FAC ¶¶ 159, 170, 178, 186, 193, 200 ("Plaintiffs incorporate by reference each and every foregoing allegation contained in the preceding paragraphs"); *Weiland*, 792 F.3d at 1321 (describing this practice as a form of "shotgun pleading").  *Second*, Plaintiffs impermissibly lump all Defendants together in their allegations.  *See id.* at 1323 ("there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."); *see also Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (remanding with instructions to strike pleading where complaint was a "quintessential 'shotgun'

pleading" as it alleged "that 'the defendants' engaged in certain conduct, making no distinction among . . . defendants charged"). For instance, infecting every one of Plaintiffs' counts are allegations of what "Defendants" did, but nothing to indicate what any individual Defendant did. *See generally* FAC. These are textbook violations of Rule 8(a), which requires dismissal. *See Joseph v. Bernstein*, 612 F. App'x 551, 555 (11th Cir. 2015).

## XI. The Amended Complaint Should Be Dismissed with Prejudice.

Defendants filed a Joint Motion to Dismiss the original Complaint on October 30, 2023. D.E. 50. Nearly six weeks later, on December 15, 2023, Plaintiffs filed their Amended Complaint without fixing *any* defects identified in Defendants' Joint Motion to Dismiss. *See* D.E. 64. In short, Plaintiffs were afforded an opportunity to remedy their pleading with the benefit of Defendants' detailed Joint Motion to Dismiss, but they elected not to make any changes. In these circumstances, and given the futility of any further amendment, dismissal of Plaintiffs' Amended Complaint with prejudice is appropriate. *See Hunter v. Atlanta Pub. Sch.*, 2020 WL 10574760, at *6 (N.D. Ga. Dec. 28, 2020) (Boulee, J.) (dismissing complaint with prejudice where plaintiff already had an opportunity to cure deficiencies and further amendment was futile).

## CONCLUSION

The Court should grant Defendants' Motion to Dismiss Plaintiff's Amended Complaint and dismiss Plaintiffs' claims with prejudice.

Dated: January 12, 2024

Respectfully submitted,

**SINTON SCOTT MINOCK & KEREW**

3438 Peachtree Road, Suite 925
Atlanta, Georgia 30326
Tel: (404) 323-0003

By: */s/Ben Van Horn*
Benjamin D. Van Horn, Esq.
bvanhorn@ssmklaw.com
Georgia Bar No. 356482
Adam J. Sinton, Esq.
Georgia Bar No. 235458
asinton@ssmklaw.com
Scott P. Kerew, Esq.
Georgia Bar No. 416629
skerew@ssmklaw.com

**ALSTON AND BIRD LLP**

One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, Georgia 30309-3424
Tel: (404) 881-7850

Keith R. Blackwell
keith.blackwell@alston.com
Georgia Bar No. 024493
William H. Jordan
bill.jordan@alston.com
Georgia Bar No. is 405112

*Counsel for UnitedHealth Group, Inc.*

**CAPLAN COBB LLC**

75 Fourteenth Street, NE
Suite 2700
Atlanta, Georgia 30309
Tel:    (404) 596-5600
Fax:   (404) 596-5612

By: */s/ James W. Cobb*
James W. Cobb
Georgia Bar No. 420133
jcobb@caplancobb.com

**HOGAN LOVELLS US LLP**

600 Brickell Avenue
Suite 2700
Miami, FL 33131
Telephone:  (305) 459-6500
Facsimile:    (305) 459-6550

By: */s/ Allen P. Pegg*
Allen P. Pegg
*Admitted Pro Hac Vice*
allen.pegg@hoganlovells.com
Daniel Balmori
*Admitted Pro Hac Vice*
Florida Bar No.: 0112830
daniel.balmori@hoganlovells.com

*Counsel for Blue Cross & Blue Shield of Florida, Inc. d/b/a Florida Blue*

**TROUTMAN PEPPER**
600 Peachtree Street, N.E.
Atlanta, GA 30308
Telephone:   (404) 885-3000

By*:  /s/ Harold Melton*
Harold Melton
Georgia Bar No.: 501570
harold.melton@troutman.com

**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500

Jeffrey S. Gleason
*Admitted pro hac vice*
JGleason@RobinsKaplan.com
Nathaniel J. Moore
*Admitted pro hac vice*
NMoore@RobinsKaplan.com

*Counsel for The Elevance Health
Companies, Inc. f/k/a The Anthem
Companies, Inc. and Blue Cross Blue
Shield Healthcare Plan of Georgia, Inc.*

**DLA PIPER LLP (US)**
200 South Biscayne Blvd.
Suite 2500
Miami, FL 33131
Telephone: (305) 423-8562
Facsimile: (305) 503-9583

By: */s/ Ardith Bronson*
Ardith Bronson, Esq.
*Admitted pro hac vice*
ardith.bronson@us.dlapiper.com

Brian H. Benjet, Esq.
*Admitted pro hac vice*
1650 Market Street, Suite 5000
Philadelphia, PA 19103
brian.benjet@dlapiper.com

Brendan Krasinski
Georgia Bar No.: 159089
1201 West Peachtree Street
Suite 2900
Atlanta, GA 30309
brendan.krasinski@dlapiper.com

*Counsel for Aetna Health Inc.
(Georgia) and Aetna Health Inc.
(Florida)*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused a true and correct copy of the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

This 12th day of January, 2024.

*/s/ Allen P. Pegg*
Allen P. Pegg

*Counsel for Blue Cross & Blue Shield of Florida, Inc. d/b/a Florida Blue*